STATE v. GEORGE WHITAKER, A. M. DeBRUHL, T. G. EMBLER, H. E. SETZER, J. E. ROGERS, FRED BLACK AND R. B. ROBERTSON.

(Filed 19 December, 1947.)

**1. Criminal Law § 81b—**

The charge of the court will be deemed without error when it is not set out in the record.

**2. Monopolies § 5—**

The violation of Chap. 328, Session Laws of 1947, declaring the public policy of this State that the right to work shall not be dependent upon membership or non-membership in a labor union, is a criminal offense. G. S., Chap. 75.

STATE *v.* WHITAKER.

**3. Constitutional Law § 11—**

The police power is reserved to the states under the Tenth Amendment to the Federal Constitution, which power is subject only to the limitations prescribed by the Federal or State Constitutions or those instances where the matter is pre-empted by Federal Law enacted pursuant to constitutionally granted authority. ·

**4. Constitutional Law §§ 11, 20a—**

"Due Process of Law" under the Fourteenth Amendment to the Federal Constitution and "Law of the Land" under sec. 17, Art. I, of the State Constitution, in relation to the exercise of the state police power, impose flexible restraints which are satisfied if the act in question is not unreasonable, arbitrary or capricious and the means selected have a real and substantial relation to the objects sought to be attained.

**5. Constitutional Law § 11—**

In determining whether a statute enacted in the exercise of the State police power is unreasonable, arbitrary or capricious or lacking in real and substantial relationship to the objective sought to be accomplished, it is proper to consider the historical development of the problem and prevailing public opinion in regard to the evils sought to be suppressed.

**6. Constitutional Law § 18—**

A statute regulating the relationship of employer and employee will not be held unconstitutional as class legislation so long as the act applies alike to all employers and employees coming within its scope.

**7. Constitutional Law §§ 12, 18—**

Chap. 328, Session Laws of 1947, is applicable to all employers and employees within the State, and therefore the fact that persons or groups coming within its scope must perforce be affected in different degrees because of the difference of their economic, social or political positions, does not render the Act unconstitutional as discriminatory.

**8. Constitutional Law § 16½—**

Chap. 328, Session Laws of 1947, does not infringe the constitutional rights of free speech or assembly, but to the contrary protects the right of employees to express their individual opinions by refusing to join unions and the right of employers and employees involved in a labor controversy to assemble and publicize their positions.

**9. Constitutional Law §§ 8a, 10b—**

In determining the constitutionality of an Act passed in the exercise of the police power, the court may determine solely whether the Act violates any constitutional limitation, the question of public policy being solely within the province of the Legislature.

DEFENDANTS' appeal from *Nettles, J.,* at July Term, 1947, of BUNCOMBE.

This is a criminal action in which the defendants were charged with a violation of Sections 2, 3, and 5 of Chapter 328 of the Sessions Laws

12—228

of 1947. For convenience of reference the statute is reproduced here in full.

"AN ACT TO PROTECT THE RIGHT TO WORK AND TO DECLARE THE PUBLIC POLICY OF NORTH CAROLINA WITH RESPECT TO MEMBERSHIP OR NON-MEMBERSHIP IN LABOR ORGANIZATIONS AS AFFECTING THE RIGHT TO WORK: TO MAKE UNLAWFUL AND TO PROHIBIT CONTRACTS OR COMBINATIONS WHICH REQUIRE MEMBERSHIP IN LABOR UNIONS, ORGANIZATIONS OR ASSOCIATIONS AS A CONDITION OF EMPLOYMENT: TO PROVIDE THAT MEMBERSHIP IN OR PAYMENT OF MONEY TO ANY LABOR ORGANIZATION OR ASSOCIATION SHALL NOT BE NECESSARY FOR EMPLOYMENT OR FOR CONTINUATION OF EMPLOYMENT AND TO AUTHORIZE SUITS FOR DAMAGES.

"*The General Assembly of North Carolina do enact:*

"SECTION 1. The right to live includes the right to work. The exercise of the right to work must be protected and maintained free from undue restraints and coercion. It is hereby declared to be the public policy of North Carolina that the right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization or association.

"SEC. 2. Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against the public policy and an illegal combination or conspiracy in restraint of trade or commerce in the State of North Carolina.

"SEC. 3. No person shall be required by any employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment by such employer.

"SEC. 4. No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment.

"SEC. 5. No employer shall require any person, as a condition of employment or continuation of employment to pay any dues, fees, or other charges of any kind to any labor union or labor organization.

"SEC. 6. Any person who may be denied employment or be deprived of continuation of his employment in violation of Sections 3, 4 and 5, or of one or more of such Sections, shall be entitled to recover from such employer and from any other person, firm, corporation, or association acting in concert with him by appropriate action in the courts of this State such damages as he may have sustained by reason of such denial or deprivation of employment;

"SEC. 7. The provisions of this Act shall not apply to any lawful contract in force on the effective date hereof but they shall apply in all respects to contracts entered into thereafter and to any renewal or extension of any existing contract.

"SEC. 8. If any clause, sentence, paragraph or part of this Act or the application thereof to any person or circumstance, shall for any reason, be adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder of this Act, and the application thereof to other person or circumstances, but shall be confined to the part thereof directly involved in the controversy in which such judgment shall have been rendered and to the person or circumstance involved.

"SEC. 9. All laws and clauses of laws in conflict with this Act are hereby repealed.

"SEC. 10. This Act shall be in full force and effect from and after its ratification."

Chapter 75 of the General Statutes makes combinations, conspiracies and contracts in restraint of trade illegal and punishable as misdemeanors.

The defendant, George Whitaker, was a building contractor of the City of Asheville. The defendant, A. M. DeBruhl, was an officer and agent of the Asheville Building and Construction Trades Council of that City. The other defendants were officers and agents of local trade unions or organizations affiliated with the American Federation of Labor, as was set out in the warrant. The defendants were convicted in the Police Court of the City of Asheville, in which the case had been duly instituted and tried, and from the judgment and sentence in this case defendants gave notice of appeal to the Superior Court, where the case was tried *de novo*. When the case was called for trial in the Superior Court, the Solicitor announced that he would try the defendants on the original warrant issued in the Police Court.

The warrant charged the defendants, George Whitaker, an employer, and A. M. DeBruhl, an officer and agent of the Asheville Building and Construction Trades Council, T. G. Embler and the other defendants as officers and agents of local trade unions and organizations "did unlawfully and willfully enter into an illegal combination or conspiracy in restraint of the right to work and of trade or commerce in the State of North Carolina and against the public policy of the State of North Carolina, by executing a written agreement or contract by and between said employer and said Labor Unions and Organizations or combinations, whereby persons not members of said unions or organizations are denied the right to work for said employer, or whereby membership is made a condition of employment or continuation of said employment by said employer and whereby said named unions acquired an employment monopoly in any and all enterprises which may be undertaken by said employer are required to become or remain a member of a labor union or labor organization as a condition of employment or continuation of employment by said employer whereby said unions acquire an employment monopoly in any and all enterprises entered into by said employer in violation of House Bill, #229, Session 1947, General Assembly of North Carolina, Chapter 328, 1947 Session Laws of North Carolina, and particularly sections 2, 3 and 5 thereof, and Chapter 75 of the General Statutes of North Carolina.

In the Superior Court the defendants made a motion to quash the warrant on the alleged grounds that the warrant did not charge a criminal offense and that Chapter 328 of the Session Laws of 1947 was enacted in violation of Article I, Section 17, of the Constitution of North Carolina and in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the Federal Constitution; and it was further alleged that the Act was in violation of freedom of speech in assembly guaranteed by the First Amendment to the Federal Constitution and protection from State invasion by the Fourteenth Amendment.

The defendants also alleged the Act was in conflict with the Labor Management Act of 1947 and Article VI, Section 2, of the Federal Constitution, but this argument was not pressed on appeal to this Court.

The motion to quash was overruled, to which the defendants excepted.

All of the defendants were convicted by the jury on the offenses charged in the warrant. The defendants thereupon made a motion for an arrest of judgment, assigning as grounds therefor the same reasons set out in the motion to quash.

This motion was overruled and sentence was imposed by the Court that each of the defendants pay a fine of $50.00 and also pay one-seventh of the costs. From this judgment and sentence the defendants appealed to this Court.

The charge of the Court to the jury was not sent up with the record and it is, therefore, to be taken that the judge fully complied with the statute, G. S., 1-180, and stated in a plain and correct manner the evidence given in the case and declared and explained the law arising thereon.

In the brief of the defendants filed in this case, it is conceded that if the statutes alleged to have been violated are valid, the warrant properly charges the offenses alleged, and that there was adequate evidence of the violation of the statute. The defendants in their brief abandoned their assignments of error Nos. 1, 2 and 3, except as to their contention that a violation of Section 3 of the 1947 Act did not constitute a criminal offense.

From the State's evidence it appeared that the defendant, George Whitaker, was a local building contractor engaged in local construction work and had been such for many years. The defendant, A. M. DeBruhl, was an officer and agent of the Asheville Building and Construction Trades Council. The defendant, T. G. Embler, was an officer and agent of the International Brotherhood of Electric Workers, Local Union No. 238; H. E. Setzer, an officer and agent of the United Brotherhood of Carpenters and Joiners of America, Local Union No. 384; J. E. Rogers, an officer and agent of the Brotherhood of Painters, Paper Hangers, and Decorators of America, Local Union No. 839; Fred Black, an officer and agent of the Bricklayers, Masons and Plasterers International Union of America, Local Union No. 1; and R. B. Robertson, an officer and agent of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Asheville Local Union No. 487.

These labor unions or organizations are all affiliated with the American Federation of Labor, with a total membership of approximately 1,260.

These defendants, by their own admission, had entered into a written contract dated the 25th of May, 1947, which was offered in evidence. This contract provided that the employer agreed to recognize the labor unions of Asheville and vicinity as the spokesmen for the workmen in the industry and the representatives of their respective trades taken collectively. It was agreed that the employer would employ none but the union members, affiliated with the Building and Construction Trades Council composed of the various unions mentioned. The use of members in good standing of the labor unions by the employer was to include skilled, semi-skilled and unskilled labor on all work thereafter to be done, directly or indirectly, by the employer.

In Section 4 of the contract, the employer agreed to abide by all rules and regulations of the respective trades affiliated with the Building and Construction Trades Council, and comply with the rates of wages and

specified hours recognized by the respective trades. Sub-contractors, if employed, would be likewise bound.

The contract in Section 6 recognized the right of the employer to discharge an employee for incompetency, intoxication or other just causes. Provision was made for arbitration in cases of disputes or differences. The agreement was to be in effect from the 25th of May, 1947, until the 25th of May, 1949, and to continue from year to year unless either party expresses a desire for a change ninety days prior to any annual termination date.

Evidence for the State was not contradicted by any of the defendants. Defendants, however, offered as witnesses certain officers of the State Federation of Labor who, without objection on the part of the State, made statements in the form of arguments, presenting their views as to union security agreements upon the economic welfare of employers and employees and the people of the State generally.

The defendant, George Whitaker, testified in the case and gave his reasons for his willingness to enter into the closed shop contract with the labor unions, which is set out in the record. He did not deny that he had entered into the contract.

The jury returned their verdict:

> "That the defendants are guilty of violating the provisions of House Bill #229, 1947 Session of the General Assembly of N. C., Chapter 328, 1947 Session Laws of North Carolina, and Chapter 75 of the General Statutes of North Carolina, as charged in the warrant."

On the coming in of the verdict the defendants moved to set it aside for errors committed on the trial. The motion was overruled and defendants excepted. Judgment was entered on the verdict that defendants pay a fine each of $50.00 and each pay one-seventh of the costs.

The defendants moved for an arrest of judgment for the grounds above alleged, and the motion was overruled. Defendants excepted.

To the judgment rendered defendants objected, and excepted; and appealed, assigning errors.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*George Pennell, Padway, Woll, Thatcher, Kaiser, Glenn & Wilson, By: Herbert S. Thatcher—for defendants, appellants.*

SEAWELL, J. The question whether violation of Sections 3, 4 and 5 of the challenged statute constitutes a criminal offense was raised in *S. v. Bishop, post,* 371, and affirmatively answered. To this we refer.

In so far as the same question is raised in this case, it may be, on the same reasoning similarly answered.

We note that appellants' brief abandons assignments of error No. 1, (R. pp. 4 & 30) and No. 2 (R. pp. 14 & 30) relating to the sufficiency of the warrant to state the charge and the sufficiency of the evidence to convict, if the statute is declaratory of a criminal offense, except· that they insist on the motion to quash the warrant and arrest the judgment for that cause. We have referred to the contention *supra.* The defense stresses the contention that Chapter 328 is in contravention of both the State and Federal Constitutions, and, therefore, void.

While the basic laws under which the validity of the challenged legislation must be determined are elementary, they are, nevertheless, so fundamental as to bear summarization at this point. The Tenth Amendment to the Constitution of the United States provides, "The powers not delegated to the United States by the Constitution nor prohibited by it to the States are reserved for the States respectively or to the people." Within this reservation of powers to the individual states, is what has been judicially termed "the police power."[1] Chapter 328 of the General Session Laws of 1947 was enacted in attempted exercise of that power. The authority of the Legislature to pass this statute, or any other measure it may deem necessary in the public welfare, is unlimited except where prohibited by the Federal or State Constitution or in conflict with Federal law enacted pursuant to constitutionally granted authority. The enactment in question has been challenged as prohibited by the Fourteenth Amendment to the Federal Constitution and Article I, Section 17, of the State Constitution.

Neither the Fourteenth Amendment nor Article I, Section 17, contains any unqualified prohibition. Both operate to prevent the Legislature from depriving anyone of individual or property rights except by due process of law. Due process is, of necessity, an elastic term which through the years has been expanded to cope with the varying problems of our increasingly complex society.

The flexible restraints which the Fourteenth Amendment has placed upon the use of its police power by a state are carefully set forth by *Mr. Justice Roberts* in *Nebbia v. New York,* 291 U. S., 502, at pages 523 and 525:

> "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of gov-

[1]"What are the police powers of a state? They are nothing more or less than the powers of Government inherent in every sovereignty to the extent of its dominion." *Judge Taney,* License cases, 5 How., 504, 583.

ernmental interference. But neither property rights or contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest.

.        .        .        .        .        .        .

"The Fifth Amendment, in the field of Federal activity, and the Fourteenth as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guarantee of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained."

The elasticity of these restrictions upon the use of the police power is the life-giving elasticity of the Constitution itself so vital to our economic, social and political growth. Perhaps more than that of any other social force, the progress of labor toward its rightful place in our society would have been retarded if all statutes enacted in the exercise of the police power had been measured on the Procrustean bed of judicial precedent.[2] The dictates of the Fourteenth Amendment, that "the means selected shall have a real and substantial relation to the object sought to be obtained," must be viewed in the light of contemporary conditions under which the Legislature has seen fit to enact the statute in question. However, it is obvious that a clear understanding of those conditions is impossible without some resort to the historical development of the governmentally imposed rules for the struggle between the employer and the employed.[3]

[2]For instance, the Supreme Court of the United States has sustained as valid exercise of this power, the statutes providing for maximum hours (*Bunting v. Oregon*, 243 U. S., 426), workmen's compensation (*New York Central Railroad Co. v. White*, 243 U. S., 188), prohibiting intimidation of employees (*People v. Washburn*, 285 Mich., 119; appeal denied, 305 U. S., 577) and prohibiting racial discrimination (*Railway Mail Association v. Corsi*, 326 U. S., 88).

[3]"Whether a law enacted in the exercise of the police power is justly subject to the charge of being unreasonable or arbitrary, can ordinarily be determined only by a consideration of the contemporary conditions, social, industrial and political, of the community to be affected thereby. Resort to such facts is necessary, among other things, in order to appreciate the evils sought to be remedied and the possible effects of the remedy proposed. Nearly all legislation involves a weighing of public needs as against private desires; and like-

STATE *v.* WHITAKER.

Until recently, the struggle between management and labor has been demonstrably one-sided with Anglo-American law favoring the side possessing "the heaviest artillery." Since the first attempts within this country to define the legal weapons and areas of combat were based upon English precedent, a brief look in that direction may be helpful.

In England, any combination of laborers to raise wages or shorten hours was a crime until 1824.[4] Until 1871, it was also a crime to threaten a strike or even to persuade an employee to leave his work;[5] in 1875, Parliament enacted legislation providing that workmen would not be subject to indictment for criminal conspiracy in effecting collectively that which was lawful for one workman to do;[6] while the closed shop was recognized as legal in 1898 by the House of Lords, acting as England's highest court,[7] that body was unwilling to declare the boycott a legal weapon of labor although it had previously held it to be a permissible economic weapon when used by a combination of shipping firms;[8] the boycott and peaceful picketing were legalized in 1906 by the Trade Disputes Act;[9] following the general strikes of 1926, Great Britain prohibited local and public authorities to enter closed shop agreements;[10] that restriction was lifted in 1946.[11]

Meanwhile, in this country early labor cases followed the English courts' interpretation of the common law. The *Philadelphia Cord-*

---

wise a weighing of relative social values. Since government is not an exact science, prevailing public opinion concerning the evils and the remedy is among the important facts deserving consideration; particularly, when the public conviction is both deep-seated and widespread and has been reached after deliberation. What, at any particular time, is the paramount public need is, necessarily, largely a matter of judgment. Hence, in passing upon the validity of a law challenged as being unreasonable, aid may be derived from the experience of other countries and of the several States of our Union in which the common law and its conceptions of liberty and of property prevail. The history of the rules governing contests between employer and employed in the several English-speaking countries illustrates both the susceptibility of such rules to change and the variety of contemporary opinion as to what rules will best serve the public interest. The divergence of opinion in this difficult field of governmental action should admonish us not to declare a rule arbitrary and unreasonable merely because we are convinced that it is fraught with danger to the public weal, and thus to close the door to experiment within the law." *Justice Brandeis,* dissenting opinion, *Truax v. Corrigan,* 247 U. S., 312, 356.

[4] 5 Geo. 4, C. 95.

[5] Criminal Law Amendment Act (1871), 34 and 35 Vic. C. 32.

[6] The Conspiracy and Protection of Property Act (1875) 38 and 39 Vic. C. 86 Section 3.

[7] *Allen v. Flood,* A. C. 1, 1898.

[8] Compare *Mogul Steamship Co. v. McGregor* (1892) A. C. 25 and *Quinn v. Leathem* (1901) A. C. 495.

[9] 6 Edw. 7, C. 47 Section 2.

[10] Trade Disputes Act of 1927, ..................................................................

[11] Trade Disputes & Trade Unions Act, 1946, 9 & 10, Geo. 6, C. 52.

*wainers case* is generally regarded as the first labor case in America; in 1806 a combination of journeymen shoemakers to effect a higher pay schedule was held illegal under the common law doctrine of criminal conspiracy.[12] This typified the early treatment of such matters. The courts made the initial inroads in the common law rules governing the employer-employee relationship, but the multiplicity of forums made for a variety of laws among the several states. The right of working-men to form unions and strike for legitimate ends was recognized in 1842,[13] but the judicial views on what constituted legitimate ends differed greatly.[14] Many states held the closed shop illegal even in the absence of prohibitive statutes; while many others regarded it as justifiable and legal.[15] It is not here necessary to multiply illustrations or attempt to catalogue judicial pronouncements on labor matters. It is, however, significant to note that *Justice Brandeis* in discussing this heterogeneous growth of labor relations law in his dissenting opinion in *Truax v. Corrigan,*[16] first spoke of ". . . the absence of legislation, to determine what the public welfare demanded . . ." and then stated "Judges, being thus called upon to exercise a *quasi*-legislative function and weigh relative social values, naturally differed in their conclusions on such questions."

Ultimately, state legislatures did attempt "to determine what the public welfare demanded" by enacting laws defining the area of permissible conflict open to industrial combatants. Their general authority to do so has been firmly established.[17] In the realm of labor contracts,

[12]*Commonwealth v. Pullis* (1806) Documentary history of American Industrial Society, Vol. 3, p. 59.

[13]*Commonwealth v. Hunt*, 45 Mass., 111, Cited in *S. v. Van Pelt*, 136 N. C., 633.

[14]For instance, in some jurisdictions the strike was held an illegal means of procuring a unionized shop; (*Plant v. Woods*, 176 Mass., 492) while in others it was held legal (*S. v. Van Pelt, supra*).

[15]Teller, Labor Disputes & Collective Bargaining, Vol. 2, sec. 424 *et seq.*

[16]*Supra*, note 3.

[17]"The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted." *Carpenters' Union v. Ritter's Cafe*, 315 U. S., 722, @ 725.

"That the State has power to regulate labor unions with a view to protecting the public interest is, as the Texas court said, hardly to be doubted." *Thomas v. Collins*, 323 U. S., 516, @ 532.

"It is true that the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of society in which they exist. This is but an instance of the power of the State to set the limits of permissible contests open to industrial combatants." *Thornhill v. Alabama*, 310 U. S., 88, pp. 103 & 104.

the Supreme Court of the United States has sustained, as valid exercise of state police power, legislation providing for maximum hours,[18] workmen's compensation,[19] forbidding payment of seamen's wages in advance,[20] prohibiting intimidation of employees,[21] and prohibiting racial discrimination.[22] In commenting on the latter decision, Professor E. Merrick Dodd stated, "Whatever might have been thought to be the law in the days when liberty of contract was treated by the Supreme Court as an almost absolute constitutional privilege, the decision in the *Corsi case* was to be expected. It is a natural consequence both of the increase in the economic power of unions and of the Supreme Court's increasing recognition, in recent years, that to refuse to treat the economic power of particular private groups as a constitutional justification for their regulation is in effect to substitute private government for government of, by and for the people. Now that employers have lost what were formerly regarded as their constitutional rights of discriminating against union members and of paying less than legislatively-determined minimum wages, now that statutory bargaining rights granted to unions have been found to create implied duties not to discriminate against racial or religious groups, a union's claim that anti-discrimination laws infringe its constitutional liberties is a palpable anachronism. Moreover, what is true of labor unions, economic institutions which even when they have no closed shop agreements, tend to obtain a large measure of job control, is presumably true *a fortiori* of employers, who are the creators of jobs."[23]

The most comprehensive gains made by labor have unquestionably been made in the field of Federal legislation. It is neither possible nor necessary for us to do more than highlight those gains in this opinion. *The Clayton Act* in 1914 restricted the use of the injunction in labor disputes in an effort to correct an almost universally recognized abuse of that judicial process.[24] This marked the first major step taken by Congress in enacting rules beneficial to labor in its conflict with management. However, it fell far short of its purpose and the Norris-LaGuardia Act in 1932 further and more specifically restricted the use of the injunction in addition to prohibiting "yellow dog contracts" and limiting the liability of union officials.[25] In 1935 Congress enacted the National

---

[18]*Bunting v. Oregon, supra.*

[19]*New York Central Railroad Co. v. White, supra.*

[20]*Patterson v. The Bark Eudora,* 190 U. S., 169.

[21]*People v. Washburn, supra.*

[22]*Railway Mail Association v. Corsi, supra.*

[23]58 HLR 1018 @ 1061.

[24]The Clayton Act, Oct. 15, 1941, C. 323, Sec. 20, 38 Stat. 730, 738.

[25]Act of March 23, 1932, C. 90, 47 Stat. 70 and 73.

[26]The National Labor Relations Act, Act of July 5, 1935, C. 3725, 149 Stat. 499.

Labor Relations Act[26] declaring the public policy of the United States to be the encouragement of collective bargaining and the protection of "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." To safeguard those rights the Act prohibited five specified types of unfair employer practices. It further provided for the settlement of questions as to who are to represent employees, and it specifically preserved the right to strike. Among other provisions of the Act was the authorization of closed shop agreements with the specific limitation that nothing contained in the Act would permit such agreements in states under whose laws they were illegal.

Perhaps it might be said with the passage of The National Labor Relations Act, "the labor movement has come full circle."[27] Perhaps that statute only marked a temporary high point in the progress of labor which will some day be surpassed. We cannot know now, and our feelings in the matter have no bearings upon the case at hand. What is more important to a consideration of this case is that Congress contemporaneously with the adoption of Chapter 328, by the North Carolina General Assembly, determined that it had gone too far in licensing weapons which labor might use in obtaining its ends and that further restrictions thereon were necessary in the public interest. The Taft-Hartley Act[28] was primarily adopted for that purpose. The purpose and provisions of that statute, therefore, become highly important to a consideration of the contemporary conditions out of which Chapter 328 also emerged.

Section 1 of the National Labor Relations Act has found, as a basis for that statute, that the national welfare had been adversely affected by several stated malpractices of management in its dealings with labor. Section 1, of the Taft-Hartley Act restated those findings on the basis of evidence considered by Congress, finding that both labor and management were guilty of acts in their relationship to each other which necessitated mutual regulation in the public interest.[29] The industrial strife and disruption of the national economy which led to this finding of dual responsibility and blame are briefly summarized in the reports which

[27]*Justice Jackson*, dissenting opinion, *Hunt v. Crumbach* (1945), 325 U. S., 821.

[28]The Labor Management Relations Act, Chapter 120, Public Law, 101.

[29]"During the last few years the effects of industrial strife have at times brought our country to the brink of a general economic paralysis. Employees have suffered; employers have suffered; and above all the public has suffered. The enactment of comprehensive legislation to define clearly the legitimate rights of employers and employees in their industrial relations in keeping with the protection of the paramount public interest is imperative." House of

accompanied the Senate and House Bills and the conference committee's report at the adoption of the Taft-Hartley Act of 1947.

Section 7 of the Taft-Hartley Act prohibits the narrowly defined closed shop, and Section 8 (3) permits a union shop subject to certain conditions. Section 14 (b) supplements these sections by providing:

> " '(b) Nothing in that Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial Law.' "[30]

Representatives, 80th Congress, First Session, Report No. 245 (Accompanying HR 3020).

"We have felt that on the record before us the abuses of the system have become too serious and numerous to justify permitting present law to remain unchanged. . . . Numerous examples were presented to the Committee of the way union leaders have used closed shop devices as a method of depriving employees of their jobs and in some cases a means of securing a livelihood in their trade or calling for purely capricious reasons." Senate, 80th Congress, First Session (Report No. 105).

[30]The possible need for supplemental state legislation, based on the actual administration of the Taft-Hartley Act, was revealed by the chief administrative officer of the National Labor Relations Board, General Counsel Robert N. Denham, in a speech to the St. Louis Bar Association on November 3, 1947. In discussing the growth of bootleg contracts for union or closed shops made in defiance of the Taft-Hartley Act, Mr. Denham stated: "At this point, it also might be well to invite your attention to a situation which has arisen on many occasions since August 22. That is, there have been occasions when employers have enjoyed satisfactory relations with the union in their plant. The contract has expired since August 22, and the union and the employer are attempting to negotiate a new contract. There is no question of recognition involved, because the employer is quite willing to recognize the union and realizes that it does, in fact, represent a majority of his employees. But the union insists that the new contract contain a union shop provision. Let us assume that the union is one which has not complied with the requirements filing certain data with the Secretary of Labor and certain affidavits of its officers with the National Labor Relations Board. In short, the union is not in a position where it can request the Board to conduct the usual union shop election. Nevertheless, the employer in seeking to maintain his relations with the union, accedes to the union's demands and executes a contract with the union shop provision in it without the required election among the employees. The National Labor Relations Board cannot prevent such a contract and there is nothing inherently illegal in it, but it does not afford either the union or the employer any protection, because, if the employer should discharge an employee at the insistence of the union for having lost his good standing with the union, even if it should be for nonpayment of dues, such a discharge would constitute an unfair labor practice and the employer could expect that if charges were filed, he would be ordered to reinstate the employee; he might be ordered to make the employee whole for back pay loss, or the union, in such circumstances, might be required to make the employee whole out of its funds."

The committee on Education and Labor explained this provision to the House as follows: ". . . by section 13 the United States expressly declares the subject of compulsory unionism one that the States may regulate concurrently with the United States, notwithstanding that the agreements affect commerce, and notwithstanding that the State laws limit compulsory unionism more drastically than does Federal law."[31]

The report of the Senate Committee on Labor and Public Welfare[32] discusses the Committee's findings and the evidence adduced by it which led to the enactment of the provisions referred to above. Those findings are so pertinent to the reasonableness and relevancy of the North Carolina "Right to Work Statute" that it behooves us to quote at length from the report.

"A controversial issue to which the committee has devoted the most mature deliberation has been the problem posed by compulsory union membership. It should be noted that when the railway workers were given the protection of the Railway Labor Act, Congress thought that the provisions which prevented discrimination against union membership and provided for the certification of bargaining representatives obviated the justification for closed-shop or union shop arrangements. That statute specifically forbids any kind of compulsory unionism.

"The argument has often been advanced that Congress is inconsistent in not applying this same principle to the National Labor Relations Act. Under that statute a proviso to section 8 (3) permits voluntary agreements for compulsory union membership provided they are made with an unassisted labor organization representing a majority of the employees at the time the contract is made. When the committees of the Congress in 1935 reported the bill which became the present National Labor Relations Act, they made clear that the proviso in section 8 (3) was not intended to override State laws regulating the closed shop. The Senate committee stated that 'the bill does nothing to facilitate closed-shop agreements or to make them legal in any State where they may be illegal' (S. Repr. No. 573, 74th Cong., 1st sess., p. 11; see also H. Rept. No. 1147, 74th Cong., 1st sess., pp. 19-20). Until the beginning of the war only a relatively small minority of employees (less than 20 per cent) were affected by contracts containing any compulsory features. According to the Secretary of Labor, however, within the last 5 years over 75 per cent now contain some form of compulsion. But with this trend, abuses of compulsory membership have become so numerous there has been great public feeling against such arrangements.

[31]House Report, 245, 80th Cong., 1st. sess., p. 34.
[32]Senate Report, 105, 80th Cong., 1st. sess., pp. 5, 6 & 7.

This has been reflected by the fact that in 12 States such agreements have been made illegal either by legislative act or constitutional amendment, and in 14 other States proposals for abolishing such contracts are now pending. Although these regulatory measures have not received authoritative interpretation by the Supreme Court (see *A. F. of L. v. Watson,* 327 U. S., 582), it is obvious that they pose important questions of accommodating Federal and State legislation touching labor relations in industries affecting commerce (*Hill v. Florida,* 325 U. S., 538; see also, *Bethlehem Steel Co. v. N. Y. Labor Board,* decided by the Supreme Court April 7, 1947). In testifying before this committee, however, leaders of organized labor have stressed the fact that in the absence of such provisions many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.

"The committee has taken into consideration these arguments in reaching what it considers a solution of the problem which does justice to both points of view. We have felt that on the record before us the abuses of the system have become too serious and numerous to justify permitting present law to remain unchanged. It is clear that the closed shop which requires pre-existing union membership as a condition of obtaining employment creates too great a barrier to free employment to be longer tolerated."

At this writing 15 states have been called to our attention in which laws have been adopted prohibiting closed shops, either by constitutional amendment or by legislative act.[33] The provisions of this legislation are comparable or substantially similar to Chapter 328.[34] Great weight must be attached to the fact that so many separate jurisdictions have, within a short space of time, seen fit to exercise their police power in the same manner and for the same purposes. The composite will of such a broad cross section of our country cannot be lightly discarded as unreasonable, arbitrary or capricious or lacking in substantial relationship to its objective. "Since government is not an exact science, prevailing public opinion concerning the evils and the remedy is among the important facts deserving consideration; particularly, when the public conviction is both deep-seated and widespread and has been reached after deliberation."[35]

---

[33]In Arizona, Arkansas, Florida and Nebraska constitutional amendments of that character have been recently adopted.

[34]Such statutes have been enacted in Delaware, Georgia, Louisiana, Tennessee, Texas, Virginia, and Iowa.

[35]*Justice Brandeis,* dissenting opinion, *Truax v. Corrigan, supra,* note 3. See also *Muller v. Oregon,* 208 U. S., 412.

The appellants contend that Chapter 328, together with Chapter 75 of the General Statutes, constitutes class legislation and is discriminating so as to deny them equal protection as guaranteed by the Fourteenth Amendment of the Federal Constitution and Article I, Sec. 17, of the State Constitution. The nature of the employer-employee relationship has itself long been recognized as constitutional justification for legislation applicable only to persons in that relative status.[36] The only question raised by the plea of discrimination is whether the statute applies alike to all employers and to all employees within its scope who may be found situated in like circumstances and conditions.[37]

Any legislation in exercise of the police power must perforce affect in different degrees persons or groups within its orbit who occupy different economic, social or political positions with reference to the ends sought by the legislation. Thus Chapter 328 may enable a non-union workman to obtain a "free ride" by receiving benefits attained through the expense and efforts of union workmen, but neither this nor other illustrations which might be given of the variable incidences of the statute upon persons differently circumstanced can render the Act discriminatory. Chapter 328 is geographically coextensive with the State of North Carolina and its provisions are applicable with the same force to all employers within those boundaries just as they are applicable to all employees therein. It is difficult to see how, within the scope of its authority, the statute could be more uniform in its application.

We can see no merit in the appellants' proposition that Chapter 328 violates the Fourteenth Amendment by abridging the rights of free speech and assembly guaranteed by the First Amendment. That argument has been used successfully against a certain type of legislation restricting union activity. The Supreme Court of the United States in *Thornhill v. Alabama, supra,* held that a state statute prohibiting peaceful picketing was void as infringing upon the natural rights secured by the First Amendment. A like result was reached in *Thomas v. Collins,* 323 U. S., 516, with respect to a state statute requiring procurement of an organization card as a prerequisite to the solicitation of workmen to join a union. However, Chapter 328 bears no resemblance to that type of statute. On the contrary, it seems to us that Chapter 328 may serve to secure the rights of free speech and assembly to all persons concerned. The statute protects the rights of workmen to organize; it further protects rights of workmen to express their individual opinions by refusing to join unions. The right of either side, or any faction of any side, to a

[36]*New York Central Railroad Co. v. White,* 243 U. S., 188. *Arizona Employers Liability case,* 250 U. S., 400. *Second Employers Liability Case,* 223 U. S., 1. *Mullen v. Oregon, supra.*

[37]*Barbier v. Connolly,* 113 U. S., 27. *Hayes v. Missouri,* 120 U. S., 68.

labor controversy to assemble and publicize its own ideas remains inviolate.

The essence of the courts' decision in *Thornhill v. Alabama,* is contained in the following statements of *Mr. Justice Murphy* at pages 102 and 103 of the opinion: "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern society." *Mr. Justice Rutledge,* speaking for the Court in *Thomas v. Collins,* stated at page 532, "The right to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as a part of free speech, but as a part of free assembly." Regardless of how salutary the net result of a closed shop agreement may be, it seems patent to us that the freedom of discussion and dissemination of ideas by all concerned in labor disputes are more restricted by such agreements than by a statute which stresses individual initiative and liberties by prohibiting the use of union membership or the absence thereof as a condition of employment.

The General Assembly of North Carolina has attempted to draw upon the residual powers of the State in an effort to remedy a situation of economic instability which has alarmed thinking people throughout the country. Those efforts have culminated in a prohibition upon the use of union membership or the absence of union membership as a condition of employment or continued employment. Substantially the same result has been reached in many other state forums which have considered the problem and also to a limited degree by the Congress of the United States.[38] In one of those States, Florida, the people adopted a Constitutional Amendment having the same purpose and effect as Chapter 328. A three judge Federal District Court held the amendment valid exercise of State police power.[39]

---

[38] See: The Labor Management Relations Act, discussed *supra.*

The Railway Labor Act, Act of May 20, 1926 C. 347, 44 Stat. 577; as amended by Act of June 21, 1934, C. 691, 48 Stat. 1185; Act of April 10, 1936, C. 166, 49 Stat. 1189, among other things, prohibits closed shop or "yellow dog" contracts in the labor relations of railroads and airlines and their employees. The constitutionality of the statute has been broadly sustained. *Shields v. Utah Idaho Cent. R. Co.,* 305 U. C., 177; *Virginia Ry. Co. v. System Federation No. 40,* 300 U. S., 515.

[39] *American Federation of Labor v. Watson,* 6 F. Supp., 1010, reversed in 327 U. S., 582, on the grounds that the Florida Amendment has not been interpreted by the highest court of Florida.

State laws similar to Section 4 which outlaw "yellow dog contracts" were first ruled unconstitutional[40] but are now regarded as valid.[41] The appellants have not questioned the constitutionality of Section 4. They contend, on the contrary, that such a provision outlawing contracts requiring abstinence from union membership should be held constitutional and that a contrary result should be reached respecting the corollary provisions of Sections 2, 3 and 5 prohibiting union membership from being made a requisite of employment. We cannot accept this view. In either instance, the state is merely delineating the area within which two factions with largely conflicting aims may wage their disputes without transgressing the public welfare. If the State may say to the employer, "you cannot deny work to anyone because of his membership in a union," we think it follows, *a fortiori,* that the state may say to the parties, "you cannot deny work to anyone because he is not a member of a union."[42]

We are not called upon here to determine the wisdom of the Legislature's action in adopting Chapter 328. Our sole concern must be whether the Legislature has acted within the limitations imposed upon it by the Fourteenth Amendment to the Federal Constitution and Article I, Section 17, of the State Constitution.[43] In determining that question we believe that Article I, Section 17, should be viewed in the same light *Justice Holmes* regarded the Fourteenth Amendment: "There is nothing I more deprecate than the use of the Fourteenth Amendment beyond the absolute compulsion of its words to prevent the making of social experiments that an important part of the community desires in the insulated chambers afforded by the several States, even though the experiments may seem futile or even noxious to me and those whose judgment I respect."

40*Coppage v. Kansas,* 236 U. S., 1.

41C: *NLRB v. Jones & Laughlin Steel Corp.,* 301 U. S., 1; *Phelps-Dodge Corp. v. NLRB,* 313 U. S., 177.

42"Accordingly, decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. . . . The Constitution protects no less the employees' converse right. Of course espousal of the cause of labor is entitled to no higher constitutional protection than the espousal of any other lawful cause. It is entitled to the same protection." *Thomas v. Collins, supra.*

43"The wisdom or lack of wisdom of a state statute or of a provision in a state constitution is not a matter for the courts. The people, through their representatives in the Legislature and through their vote for an amendment to their constitution, have the right to commit folly if they please, provided it is not prohibited by the Federal Constitution or antagonistic to Federal statutes authoritatively enacted concerning the matter involved. 'The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands.' " *American Federation of Labor v. Watson, supra.*

While, perhaps, we do not share the resentment expressed by the great Jurist, we may point out that the Congress seems to have made clear its intention to recognize as valid the particular experiment inaugurated by Chapter 328.

In summary, the case, stripped to decisional factors, falls into simple lines. The power of the State by general legislative act, in the exercise of its police power, to condemn private contracts found to be injurious to the public welfare, to declare them contrary to public policy and prevent their consummation cannot be denied. Exercised within constitutional limitations, it is both a necessary and a salutary function of government, the exercise of which is not infrequently an exigent duty. Within those limitations the occasion justifying the exercise of the power is within the legislative discretion, provided only that its action is not arbitrary or capricious and has a reasonable relation to the end sought to be accomplished.

The rights of property guaranteed by our Constitution are necessarily relative to those held by others under the same Constitutional sanctions. The right of contract, whether considered as natural or merely civil, is a property right; certainly of no greater dignity than the right to work, ordinarily regarded as inalienable; and it cannot be unrestrictedly used to the injury of another. Under such circumstances the exercise of the State's police power in its regulation is not a violation of Due Process required by the Fourteenth Amendment. We cannot find that the Legislature exceeded its powers. The General Assembly felt that it could no longer avoid the issue of the closed shop; and probably felt that so far as it concerned the principle which it felt should be preserved there is no substantial difference between the "closed shop" and the so-called "all union shop." We cannot say that the matter was not a proper subject of governmental regulation or that government has become so ensnarled in its own charter as to be forced to admit its impotency.

Being of that opinion we further conclude that the record does not disclose error which would justify us in disturbing the result of the trial. We find

No error.