189 P.2d 912

**AMERICAN FEDERATION OF LABOR et al. v. AMERICAN SASH & DOOR CO. et al.**

No. 5028.

Supreme Court of Arizona.

Feb. 4, 1948.

J. H. Morgan and H. S. McCluskey, both of Phoenix, and Herbert S. Thatcher, of Washington, D. C. (Minne & Sorenson and George Wilson, both of Phoenix, of counsel), for appellants.

John L. Sullivan, Atty. Gen., John W. Rood, Chief Asst. Atty. Gen., and Moeur & Moeur, Jennings, Strouss, Salmon & Trask, J. A. Riggins, Jr., Henry S. Stevens, and Burr Sutter, all of Phoenix, for appellees.

UDALL, Justice.

This appeal involves a determination of the constitutionality of what has been commonly styled the "Right to Work" Amendment to the Arizona Constitution. For reasons which will be later developed, we have neither the duty nor the right to consider or judge the wisdom of this legislation or its practicability. Our function is limited to finding whether it offends the Constitution of the United States. The people of the State of Arizona at the general election held in 1946 adopted an Amendment to the Constitution of the State of Arizona, reading as follows:

"No person shall be denied the opportunity to obtain or retain employment because of non-membership in a labor organization, nor shall the state or any subdivision thereof, or any corporation, individual

or association of any kind enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of non-membership in a labor organization." Petition and Governor's Proclamation validating it appear in 1947 Session Laws of Arizona at page 399.

The Amendment (and as such it will hereafter be designated) became effective upon proclamation by the Governor dated November 25, 1946. On February 12, 1947, the appellants (plaintiffs below), as representatives of one segment of labor, filed this civil action to procure a declaratory judgment, under Article 7, Chapter 27, A.C.A.1939, in respect to its validity, interpretation and effect, and for injunctive relief against its enforcement.

The trial court, while denying motions of appellees (defendants below) to strike portions or all of the forty-page complaint, commented that "far more than half of the complaint is wholly immaterial and irrelevant" but it granted their motion to dismiss the complaint. Appellants having elected to stand thereon, judgment was entered dismissing the action, and from the order and judgment of dismissal this appeal was taken.

No testimony was taken in the court below, and we have properly before us no conclusions of law, but only the facts well pleaded in the complaint (and, therefore, impliedly admitted by appellees by their motion to dismiss), together with such other matters of which we may take judicial notice.

*Parties to Suit*

The appellants are various national and local labor organizations affiliated with the American Federation of Labor and an employer and an employee, all of whom have entered into or desire to enter into union-security agreements in Arizona. The appellees are: (1) The Attorney General of Arizona (the present incumbent Evo De Concini having been substituted for, and having adopted the same position as, his predecessor) who, as the chief law enforcement officer, it is alleged, had threatened to institute civil and criminal proceedings against all persons violating said Amendment; (2) various employers who are parties to union-security agreements; and (3) individual employees whose employment status would be affected by reason of such agreements.

*Issues*

By appropriate assignments of error and propositions of law, appellants challenge the Amendment as being either invalid and unconstitutional, or at least inoperative as to certain contracts, for the following reasons: (1) The Amendment arbitrarily and unreasonably impairs the obligations of existing contracts and deprives both unions and employers of freedom of contract, all in violation of Article 1, Section 10, of the United States Constitution and the due process clause of the Fourteenth Amend-

ment. (2) The Amendment constitutes class legislation and is highly discriminatory, denying unions and union members the equal protection of the laws contrary to the Fourteenth Amendment. (3) The Amendment impairs and previously restrains the exercise of the civil rights of assembly and speech guaranteed under the First Amendment. (4) In the event the Amendment be held valid by this court, appellants contend that it does not apply to contracts now existing which were entered into previous to the effective date of its adoption

In the court below appellants urged that the Amendment was invalid because it was in conflict with the Wagner Act. 29 U.S. C.A. § 151 et seq. However, since passage by Congress of the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., they have, for obvious reasons, abandoned this ground in presenting the instant appeal.

■ Neither need we here determine whether said Amendment is self-executing as this was not advanced either in the assignments of error or in the arguments contained in the briefs. It is evident, at least, that the Eighteenth Legislature considered additional sanctions necessary because that body, in regular session assembled, enacted four measures, Senate Bills numbered 3, 65, 66, & 67, to implement it. Senate Bill No. 65 became a law, Chapter 81, Session Laws of Arizona 1947, at page 173, with the Governor's approval on March 20, 1947. That law provides for injunctive relief and suits for damages for violations of the Amendment and also declares contracts prohibited by it to be illegal and void. No criminal penalties are prescribed. The other three measures (providing for conciliation of labor disputes, the enforcement by suits at law of collective bargaining agreements, and prohibiting secondary boycotts) never became law by reason of being vetoed by the Governor after adjournment of the legislature. These measures appear with other vetoed bills on pages 414 to 423 inclusive of the 1947 Session Laws.

■ The authority of the people of Arizona to amend their Constitution is unlimited except where prohibited by the Federal Constitution or in conflict with federal law enacted pursuant to constitutionally granted authority. However, an amendment has no greater validity and stands on no higher plane than legislative enactment insofar as being subject to attack for failure to square with the Federal Constitution. Ohio & M. R. R. Co. v. McClure, 10 Wall. 511, 19 L.Ed. 997; Denver v. New York Trust Co., 8 Cir., 187 F. 890; Id., 225 U.S. 707, 32 S.Ct. 839, 56 L.Ed. 1266; New Orleans Water-Works Co. v. Louisiana Sugar Refining Co., 125 U.S. 18, 8 S.Ct. 741, 31 L.Ed. 607.

*Police Power*

■ Counsel for appellees concede that justification for the Amendment in question must be found under what has been judicially termed the "police power" of the state. There is, in the strict sense,

no federal police power, A. F. of L. v. Watson, D.C., 60 F.Supp. 1010, because that is one of the powers impliedly reserved to the states by the Tenth Amendment. Justice Taney in License Cases, 5 How. 504, 583, 12 L.Ed. 256, 257, defined the police powers of a state as being "nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions." This undefined power of government covering the health, safety, or welfare of the people bears the same relation to the state that the principle of self-defense bears to the individual.

## The Question

■ Recognizing, then, that the liberty to, and right of, contract are not absolute and unyielding but are subject to being limited, restrained, and circumscribed in the interest of the state and the welfare of its people, the question here is: Was the police power of the state (by the people's adoption of the Constitutional Amendment here under review) so unreasonably, arbitrarily, or capriciously exercised as to be unconstitutional and therefore void?

## Freedom to Contract—Due Process

Appellants' first assignment of error and proposition of law state, in effect, that the Amendment under consideration is unconstitutional: first, in that it violates that part of Article 1, Section 10 of the United States Constitution which says "No State shall * * * pass any * * * Law impairing the Obligation of Contracts * * *"; and, second, in that it is also violative of that part of the Fourteenth Amendment which sets forth the proposition that "No State shall make or enforce any law which shall * * * deprive any person of life, liberty, or property, without due process of law; * * *."

■ It is well settled that for certain proper purposes the state may limit the constitutionally guaranteed freedom to, and sanctity of, contract. Appropriate exercise of the state's police power, e. g., legislation in the interest of the public health, safety, and welfare, has been held to be such a purpose. And relations between employer and employee have been recognized by the United States Supreme Court to be proper subjects for legislative regulation under the state's police power to legislate for the general welfare. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Carpenters and Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed 703, 108 A.L.R. 1330; 11 Am.Jur., Constitutional Law, section 345, and cases therein cited. It would serve no useful purpose to multiply authorities or extend this opinion with examples of such use of the police power.

There is no disagreement between the litigants that the Amendment under consideration is an attempted use of the police power; and as such it must stand or fall. The first task, then, is to determine by what

standards a court should judge whether such power has been properly used. Both appellants and appellees direct our attention to, and rely for the most part upon, the standards for judgment set forth in three landmark decisions of the United States Supreme Court and one decision from this court. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; West Coast Hotel Co. v. Parrish, supra; Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481; State v. Childs, 32 Ariz. 222, 257 P. 366, 54 A.L.R. 736.

In the Nebbia case the question for decision was whether the New York statute fixing the minimum selling price for milk violated the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution. The United States Supreme Court sustained the validity of the New York law stating in part [291 U.S. 502, 54 S.Ct. 510]:

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that *the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.* * * *"

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a *reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied,* and judicial determination to that effect renders a court functus officio. * * * *With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal.* The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that *the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity,* and that though the court may hold views inconsistent with the wisdom of the law, *it may not be annulled unless palpably in excess of legislative power."* (Emphasis supplied.)

In State v. Childs, supra [32 Ariz. 222, 257 P. 367], this court was faced with the question of whether a statute which re-

quired, among other things, that patent or proprietary drugs be sold only by registered pharmacists was a proper exercise of the police power to legislate for the public health and safety. In denying that it was a proper exercise of the power this court said:

" * * * *while every presumption is in favor of the validity of a statute, yet when it clearly appears that on no reasonable theory could such a one contribute to the public health or safety* it is the duty of the courts to so declare and to set it aside as unconstitutional * * *. (Citing cases.)"

" * * * This (police) power is, no doubt, a very broad one, and, within its legitimate sphere, a very useful one. It is wholly within the discretion of the Legislature when to exercise it, and to determine what are the best means to accomplish the desired object. *Courts will never assume to determine whether the law is a wise one, or whether the Legislature have adopted the best means.* Yet there is a limit to this power. A law enacted in the exercise of the police power must, in fact, be a police law. * * * It is, at least, settled that, *if it is apparent on the face of the act that its provisions, from their very nature, cannot and will not conduce to any legitimate police purpose, it is the right as well as the duty of the court to pronounce it invalid,* * * *." (Emphasis supplied.)

In West Coast Hotel Co. v. Parrish, supra, the Supreme Court upheld as a valid exericse of the police power a law of the State of Washington which authorized the fixing of minimum wages for women. In that case the court specifically reaffirmed its holding in the Nebbia case quoting much of the same language from it that we have here set out as the standard, test, or measure by which to judge whether the police power has been appropriately exercised.

In Home Building & Loan Ass'n v. Blaisdell, supra, [290 U.S. 398, 54 S.Ct. 240] the Supreme Court upheld a Minnesota law extending the period of redemption in mortgage foreclosures as against the contention that such law impaired the obligation of existing mortgages. The court, after restating the proposition that proper police legislation may justify state regulation of contract rights, said:

" * * * The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end. * * *"

Other pronouncements of the United States Supreme Court on the subject of the standard or test by which the validity of the exercise of police power is judged are as follows:

" * * * But liberty of making contracts is subject to conditions in the in-

30

terest of the public welfare, and which shall prevail—principle or condition—*cannot be defined by any precise and universal formula.* Each instance of asserted conflict must be determined by itself, and it has been said many times that *each act of legislation has the support of the presumption that it is an exercise in the interest of the public. The burden is on him who attacks the legislation,* and it is not sustained by declaring a liberty of contract. It can only be sustained by demonstrating that it conflicts with some constitutional restraint, or that the public welfare is not subserved by the legislation. *The legislature is, in the first instance, the judge of what is necessary for the public welfare, and a judicial review of its judgment is limited. The earnest conflict of serious opinion does not suffice to bring it within the range of judicial cognizance."* Erie R. Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 764, 58 L.Ed. 1155, 51 L.R.A.,N.S., 1097. (Emphasis supplied.)

" * * * Hence, in passing on the validity of the present classification, it is not the province of a court to hear and examine evidence for the purpose of deciding again a question which the legislature has already decided. *Its function is only to determine whether it is possible to say that the legislative decision is without rational basis.* * * *" Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 751, 83 L.Ed. 1001. (Emphasis supplied.)

See also: Florida Cent. & P. R. Co. v. Reynolds, 183 U.S. 471, 22 S.Ct. 176, 46 L.Ed 283; Ex parte McCardle, 7 Wall. 506, 19 L.Ed.264; Soon Hing v. Crowley, 113 U.S. 703, 5 S.Ct. 730, 28 L.Ed. 1145; South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 625, 58 S.Ct. 510, 82 L.Ed. 734, 735; Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721; Standard Oil Co. v. Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856, 857; Nashville, C. & St. L. Ry. Co. v. White, 278 U.S. 456, 49 S.Ct. 189, 73 L.Ed. 452, 453; McLean v. Arkansas, 211 U.S. 539, 29 S.Ct. 206, 53 L.Ed. 315; Tanner v. Little, 240 U.S. 369, 36 S.Ct. 379, 60 L.Ed. 691; Chicago B. & Q. R. Co. v. McGuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328, 329; Arizona Copper Co. v. Hammer, 250 U.S. 400, 39 S.Ct. 553, 63 L.Ed. 1058, 1059, 6 A.L.R. 1537; Gant v. Oklahoma City, 289 U.S. 98, 53 S.Ct. 530, 77 L.Ed. 1058; Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed 772.

*Yardstick*

These quotations have been set forth at the risk of lengthening this opinion in order to demonstrate that the test is not an exact one, but that from the pronouncements of the United States Supreme Court we can obtain at least some general guidance as to a standard by which to judge the validity of such legislation. Summed up, it might be stated like this: The right of

contract may be regulated by proper use of the police power of the state. Legislation in aid of this police power carries with it a strong presumption of validity placing the burden of proof upon him who attacks it. It is not the province of the courts to review either the wisdom or practicability of the Amendment, nor does the earnest conflict of opinion on these matters bring it within judicial cognizance. Such legislation can be annulled by court decision only if it is palpably in excess of legislative power, if it is without any rational basis, and if on no reasonable theory could it contribute to the public health, welfare, or safety.

*Reasonableness & Discrimination*

Nor is the Amendment in question indefensible on the grounds of reasonableness. The National Labor Relations Act prohibits "yellow-dog" contracts in much the same fashion as our own legislature has prohibited them in Arizona, Sections 43-1608 and 56-120, A.C.A.1939. The United States Supreme Court has sustained this federal legislation. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R.1217. If it is proper to legislate to the effect that no employee shall be forced, as a condition of employment, to be a nonunion man it would seem that legislation providing that no employee shall be forced, as a condition of employment, to be a union man,

would be but a logical counterpart. Appellants attempt to answer this by an interesting contradiction within their own briefs. On the one hand they direct our attention to outdated and overruled cases and annotations holding anti-yellow-dog-contract legislation invalid. They admit that the Arizona statutes have never been tested, but suggest by implication that if tested they would, on the basis of this old line of decisions, be found invalid. Then, they conclude, "That if a law which prohibits an employer from denying employment to a union member is invalid, then the converse is true, and the amendment which prevents an employer from denying employment to a nonunion laborer is also invalid." However, in their own opening brief they recognize that "yellow-dog" contracts now can be and are constitutionally outlawed, and that their own citations to the contrary are now obsolete, overruled, and no longer the law when they state that "the state can constitutionally outlaw the so-called 'yellow-dog' contract whereunder nonmembership in the union is required as a condition of employment." (The old line of cases upholding "yellow-dog" contracts was based upon Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A. 1915C, 960. As was stated in Phelps Dodge Corp. v. N.L.R.B., supra, [313 U.S. 177, 61 S.Ct. 849], "The course of decisions in this Court since Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764,

and Coppage v. Kansas * * * have completely sapped those cases of their authority.")

Appellants then continue with the other half of their contradiction. Assuming this time that our anti-yellow-dog-contract statutes are valid, they contend that the Amendment under consideration is discriminatory and unconstitutional by the terms of the Fourteenth Amendment in that it constitutes an "outrageous denial" to unions and union members of equal protection of the law. The gist of their argument is this: "Neither section (43-1608 or 56-120, A.C.A.1939, invalidating yellow-dog contracts) makes it unlawful for the employer to deny employment to a union man or to discharge him on the ground that he is a member of a union. The sections are limited in operation to the execution of contracts whereby the employee agrees not to remain or become a member of a labor organization. While the employer, if the sections are valid, would have no right to enter into the contracts condemned, he would have the undoubted right to refuse to hire a union man, and the right to discharge him upon the ground that he was a member of the union."

Appellants concede that in the field of interstate industries the National Labor Relations Act provides the protection they seek. In regard to those industries whose business is wholly intrastate we must point out that the equal protection clause requires only "that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." Hayes v. Missouri, 120 U.S. 68, 7 S.Ct. 350, 352, 30 L.Ed. 578. There is no question but that this test is here met. Nor is it necessary for the people to have encompassed in one constitutional amendment a corrective for all the evils which may or do arise in the field of employer-employee relations.

"* * * This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The Legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' *If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.'* There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms. * * *" West Coast Hotel Co. v. Parrish, supra [300 U.S. 379, 57 S.Ct. 585]. (Emphasis supplied.)

"* * *We have frequently said that the legislative authority, exerted within its proper field, need not embrace all the evils within its reach.* The Constitution does not forbid 'cautious advance, step by step,' in dealing with evils which are exhibited in activities within the range of legislative power. * * *" N.L.R.B. v. Jones &

Laughlin Steel Corp., supra [301 U.S. 1, 57 S.Ct. 628]. (Emphasis supplied.)

"Any legislation in exercise of the police power must perforce affect in different degrees persons or groups within its orbit who occupy different economic, social or political positions with reference to the ends sought by the legislation. Thus Chapter 328 may enable a non-union workman to obtain a 'free ride' by receiving benefits attained through the expense and efforts of union workmen, but neither this nor other illustrations which might be given of the variable incidences of the statute upon persons differently circumstanced can render the Act discriminatory. Chapter 328 is geographically co-extensive with the State of North Carolina and its provisions are applicable with the same force to all employers within those boundaries just as they are applicable to all employees therein. It is difficult to see how, within the scope of its authority, the statute could be more uniform in its application." State v. Whitaker, N. C., 1947, 45 S.E.2d 860, 871 (not yet reported in state report). (Emphasis supplied.)

We hold that by this standard the Amendment is not discriminatory, and, hence, appellants' assignment of error No. 2 is without merit.

*Pro and Con*

As stated before, because of the presumption that the Amendment is a proper exercise of the police power in the interest of the public, the burden is upon appellants to establish that it is without rational basis. To sustain this burden they earnestly contend that such a law strikes at the roots of the security of unionism as an institution, and that enforcement of the Amendment will eventually destroy labor organizations in Arizona. Arguendo, they say that outlawing any type of union-security agreement (whether the traditional union shop, closed shop, or maintenance of membership) destroys the principle which, as Justice Jackson said, is the "ultimate goal of most union endeavor." Wallace Corp. v. N.L.R.B., 323 U.S. 248, 65 S.Ct. 238, 247, 89 L.Ed. 216. Union security agreements, they claim, have never been judicially held malum in se but on the contrary are an established practice in modern industrial society and have been uniformly recognized and upheld throughout the nation. They contend that any abuses or injurious practices that may exist therein may be readily corrected by legislation aimed specifically at such abuses without absolute prohibition of union-security contracts. They further point out that such agreements are of benefit to organized labor in that they are designed to gain job security, protection from discrimination, equality of bargaining power, and the promotion of better working conditions for all employees; that with such agreements in force disciplinary action may be more effectually imposed upon workers to compel their compliance with existing contracts; and, finally, that they eliminate jurisdictional strife and result in

better labor-management cooperation. Incidentally, they point out, such agreements eliminate the "free riders" (nonunion members who benefit by union efforts but do not share the costs). All in all, they conclude that there are no overwhelming evils incident to the union-security relationship that can be cured only by prohibitory legislative fiat such as the Amendment in question. Based upon their contention that circumstances do not warrant the suppression of such agreements, they charge the Amendment to be arbitrary, unreasonable, and excessive.

Appellees, however, maintain that appellants' claim as to injuries resulting from the Amendment are "more fanciful than real" in that the Amendment does not discriminate against union members, prohibit membership in a union, or interfere with well-established collective bargaining processes such as the right to strike and to picket peaceably. Furthermore, appellees contend that the Amendment was enacted through the Initiative by the people of the State of Arizona (our supreme legislative power) to eliminate bona fide abuses that had arisen in the field of labor-management relations, and to overcome the evils incident to the closed shop. This was an effort by the legislative department to satisfy what they believed were the demands of public welfare by diminishing in part the area of permissible conflict open to industrial combatants. Evidently the people of Arizona determined that in the public interest the weapons which labor might use in obtaining its ends required further restriction. On the national scene the Taft-Hartley Act undoubtedly was adopted for that very purpose. (See Committee Reports of the 80th Congress, First Special Session, Senate Report No. 105 and House Report 245 outlining existing abuses.) From the 1946 Initiative and Referendum Publicity Pamphlet and from appellees' brief we summarize some of the evils and abuses alleged to have arisen: (1) A monopoly of labor which the closed shop fosters such being its ultimate goal; (2) "featherbedding", (doing less than a worker is capable of, caused by restrictive union rules); (3) secondary boycotts; (4) jurisdictional disputes. Affirmatively appellees assert that the Amendment aids in establishing industrial peace and, above all, that it prohibits a denial or abridgment of any person's right to obtain or retain employment because of nonmembership in any labor organization.

The people of the State of Arizona evidently had some deep-seated convictions upon these matters for it required the signatures of fifteen per cent of the qualified electors of the entire state to even propose an amendment to the Constitution, Article 4, Part 1, Section 1 (2), and it is a matter of common knowledge that the arguments for and against the proposed Amendment were fully and completely presented to the people in the pre-election campaign. In adopting the Amendment by a

very substantial majority (61,875 votes cast for and 49,557 cast against said measure) the people have in the most solemn manner evidenced their conviction that the matters prohibited by it were detrimental to the public welfare. We are not called upon here to determine either the wisdom of the people's action or who is right and who is wrong in the opposing arguments here summarized. Possibly only time can give a correct answer to this highly controversial question. Our sole concern is whether the Amendment is in violation of the federal organic law. The test we must apply is simply to discover whether the law "has a rational basis" and "could on any reasonable theory contribute to the public welfare." The considered and deliberate action of the people of Arizona has determined this in the affirmative; rule by the majority is the essence of democracy.

*Effect of Similar Legislation*

In his famous dissenting opinion in Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 138, 66 L.Ed. 254, 27 A.L.R. 375, Justice Brandeis said:

" * * * Since government is not an exact science, prevailing public opinion concerning the evils and the remedy is among the important facts deserving consideration, particularly when the public conviction is both deep-seated and widespread and has been reached after deliberation. * * *"

See also Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551, 13 Ann.Cas. 957.

In this regard it is instructive to note that within a fairly short space of time no less than sixteen states have adopted similar legislation, four by constitutional amendment (Arizona, Amendment adopted Nov. 1946, Laws 1947, p. 399; Arkansas, Amendment No. 34, adopted Dec. 1944; Florida, Amendment adopted Nov. 1944, Declaration of Rights, § 12; Nebraska, Amendment adopted Nov. 1946, Const. art. 15, §§ 13–15), and twelve by statute (Delaware 1947, 46 Del.Laws, c. 196, Georgia 1947, Laws 1947, p. 620, Louisiana 1934, Act No. 202 of 1934, Maryland 1935, Code 1939, art. 100, § 65, Maine 1947, Laws 1947, c. 395, North Carolina 1947, Laws 1947, c. 328, North Dakota 1947, Laws 1947, c. 243, South Dakota 1945, Laws 1945, c. 315, Const.Amend.1947, Const. art. 6, § 2, Tennessee 1947, Pub.Acts 1947, c. 36, Texas 1947, Vernon's Ann.Civ.St. art. 5207a, Virginia 1947, Acts 1947, Ex.Sess., c. 2, Iowa 1947, Acts 52d, Gen.Assem., c. 296). In New Mexico the legislature has submitted a similar constitutional amendment to the people for their approval. Laws 1947, p. 564. The lower courts of three of the above states have recently upheld these statutes as not being in conflict with the state and federal constitutions. A. F. of L. v. American Sash & Door Co. (Ariz., July 28, 1947—this case); Federal Firefighters of Oak Ridge v. Roane-Anderson Co. (Tenn., April 15, 1947 [1]); Lincoln Federal Labor Union v. Northwestern Iron & Metal Co. (Neb., July 7, 1947). In addition, the

**36**

North Carolina Supreme Court in a well-reasoned opinion has sustained the validity of its statute (State v. Whitaker, N.C., 1947, 45 S.E.2d 860); and a three-judge Federal District Court for the Southern District of Florida did likewise with the Florida statute (A. F. of L. v. Watson, D. C., 60 F.Supp. 1010, reversed by the Supreme Court of the United States on jurisdictional grounds only, A. F. of L. v. Watson, 327, U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873).

■ In the field of federal legislation the principles set forth in the Amendment under consideration have been adopted in several instances. The Railway Labor Act, 45 U.S.C.A. § 152, Fifth, provides that:

"Agreements to join or not to join labor organizations forbidden

"Fifth. No carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization; and if any such contract has been enforced prior to the effective date of this chapter, then such carrier shall notify the employees by an appropriate order that such contract has been discarded and is no longer binding on them in any way."

The United States Supreme Court had occasion to review this legislation and sustained it. Virginian R. Co. v. System Federation No. 40, R. E. D., 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Texas & N. O. R. Co. v. Brotherhood of R. & S. S. Clerks,

281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034. Again, the Federal Bankruptcy Act of 1933, 47 Stat. 1481, sec. 77, subs. p, q, 11 U.S.C. A. § 205 note, prohibits a trustee in bankruptcy from entering into a closed-shop agreement with a union covering employment in any enterprise for which he is acting as trustee. And, finally, Title 1, Section 14(b) of the Taft-Hartley Act, 29 U.S. C.A. § 164(b), amending the National Labor Relations Act specifically recognizes the right of states to pass such legislation, and appropriately restricts the use of federal law when such occurs by stating:

"Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

In view of the great number of states which have seen fit to consider such legislation an appropriate and necessary exercise of the police power, and in view of the recognition given by the federal government both to the principles contained in such legislation and the right of states to adopt such, it might well be presumptuous of this court, in applying the test for such legislation set down by the Supreme Court of the United States, to find our Amendment "palpably in excess of legislative power," "without rational basis," and to hold that "on no reasonable theory could it contribute to the public health, safety or

welfare." We find ourselves in agreement with the following statement of Associate Justice Seawell, writing for the Supreme Court of North Carolina in the decision which sustained the constitutionality of a similar act (State v. Whitaker, supra):

"* * * Great weight must be attached to the fact that so many separate jurisdictions have, within a short space of time, seen fit to exercise their police power in the same manner and for the same purposes. The composite will of such a broad cross section of our country cannot be lightly discarded as unreasonable, arbitrary or capricious or lacking in substantial relationship to its objective. * * *"

And, to the same effect but concerning a different sort of police power legislation, Chief Justice Hughes in West Coast Hotel Co. v. Parrish, supra, said:

"* * * The adoption of similar requirements by many states evidences a deepseated conviction both as to the presence of the evil and as to the means adapted to check it. Legislative response to that conviction cannot be regarded as arbitrary or capricious and that it all we have to decide. Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment."

*Freedom of Speech and Assembly*

Appellants' third assignment of error and third proposition of law are devoted to the contention that "the amendment impairs and previously restrains the exercise of the civil rights of assembly and speech guaranteed under the First Amendment, and as protected against state invasion by the Fourteenth Amendment", and they claim that for this reason the court erred in dismissing the complaint and rendering judgment for appellees. Appellants support this contention with the argument that "by the prohibition of union shop agreements * * * organizations of laborers, for the purpose of assembly, speech and security, are wholly ineffective."

In this regard appellants direct our attention to four recent landmark decisions of the United States Supreme Court. Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Thornhill v. Alabama, supra; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. These cases, appellants contend, establish the principle that the right to assemble and function through labor organizations is a concomitant of the civil right of assembly guaranteed by the foregoing constitutional provisions. With this summary of the general tenor of these holdings we agree. But the application of either the facts or principles announced in those cases to the case at bar is difficult to see.

In the Hague case, supra, the C.I.O. union complained that a Jersey City ordinance (which forbade the leasing of any hall without a permit from the Chief of

38

Police for a public meeting at which the speaker would advocate the obstruction, overthrow, or change of government by other than lawful means) was being used to prevent the union from discussing rights afforded to workers by the National Labor Relations Act. And that another ordinance (forbidding the public distribution of printed matter) prevented the union from informing workers of their rights by circulars. The court held that such use of these ordinances infringed the privileges and immunities of citizens concerned as "the right peaceably to assemble and to discuss these topics, and to communicate respecting them, whether orally or in writing, is a privilege inherent in citizenship of the United States which the (Fourteenth) Amendment protects." [307 U.S. 496, 59 S.Ct. 962].

The Thornhill case, supra [310 U.S. 88, 60 S.Ct. 746], was concerned with the use of an Alabama anti-picketing statute, when used to prohibit peaceful picketing. The court held that "The danger of breach of the peace or serious invasion of rights of property or privacy at the scene of a labor dispute is not sufficiently imminent in all cases to warrant the legislature * * * (passing such a law)," and that "The freedom of speech and of the press guaranteed by the Constitution embraces at least the liberty to discuss publicly * * * all matters of public concern without previous restraint or fear of subsequent punishment."

The Barnette case, supra, dealt with a resolution adopted by the West Virginia Board of Education requiring that a salute to the flag be a regular part of the activities of their public schools and that refusal to comply therewith be grounds for suspension. Certain children subscribing to the faith of Jehovah's Witnesses refused to salute as being against the dictates of their faith in that the salute represented to them placing an image of man above the laws of God. The court held that expulsion from school for such refusal invaded the sphere of the intellect and spirit which it is the purpose of the First and Fourteenth Amendment of the Constitution to reserve from all official control.

Thomas v. Collins, supra, dealt with a Texas statute, Vernon's Ann.Civ.St. art. 5154a, which required an out-of-state union speaker to secure an organizer's card from state officials before being allowed to speak and solicit union memberships. The court reaffirmed the power of the state to regulate labor unions with a view to protecting public interest but held that freedom of speech and assembly cannot be restricted unless required to save the public from a clear and present danger.

The foregoing brief summary of the situations which faced the United States Supreme Court in these free-speech cases constitutes the best possible answer to their applicability to the case at bar. Nothing in the Amendment here under consideration either prevents, restricts, or even attempts to regulate the freedom of men to speak, assemble, or think. The Amendment goes solely to prohibiting certain types of em-

ployment contracts or policies which the voters of Arizona believe work an injustice to nonmembers of labor organizations and so mitigate against the public welfare. We are impressed with the very recent statement of the Supreme Court of North Carolina on this subject:

"* * * On the contrary, it seems to us that Chapter 328 may serve to secure the rights of free speech and assembly to all persons concerned. The statute protects the * * * rights of workmen to express their individual opinions by refusing to join unions. The right of either side, or any faction of any side, to a labor controversy to assemble and publicize its own ideas remains inviolate." State v. Whitaker, supra.

For the foregoing reasons we hold that the Amendment in nowise violates the constitutional rights of freedom of speech or assembly.

*Prospective and Retrospective Operation*

 Holding as we do that the Amendment is constitutional, there remains to be decided only the question of whether it applies to contracts existing at the effective date of the Act. Appellants, as their fourth assignment of error, charge that the trial court improperly held the Amendment to void such contracts. And a part of their fourth proposition of law states:

"Constitutional, like statutory provisions are construed to operate prospectively only, unless on the face of the measure the contrary intention is clearly manifest. * * *"

The above quoted portion of the fourth proposition of law is entirely sound and correct. 11 Am.Jur., Constitutional Law, section 35; 16 C.J.S., Constitutional Law, § 40(a); City of Shreveport v. Cole, 129 U.S. 36, 9 S.Ct. 210, 32 L.Ed. 589. It is difficult, however, to understand appellants' attempted application of this rule of law to the case at bar. The Amendment in question provides that from and after its effective date "No person shall be denied the opportunity to obtain or retain employment * * * (etc.) or any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment. * * * (etc.)" The latter clause specifically prevents future contracts of a kind inimical to the Amendment, while the former clause grants immediately to persons concerned the protection the Amendment affords. As has been previously shown, there is reserved to the state the right to regulate and control contracts, and the Constitution and laws of the state are a part of each contract. Home Building & Loan Ass'n v. Blaisdell, supra. The effect of appellants' argument is that persons by making contracts extending into the future may prevent the exercise of the police power by the state. The agreements in the record extend year after year unless terminated by thirty days' notice at the end of an annual period. It must be remembered that a statute is not retrospective from the mere fact that it relates to antecedent facts. Cox v. Hart, 260 U.S. 427, 43 S.Ct. 154, 67 L.Ed.

332; State v. Martin, 59 Ariz. 438, 130 P.2d 48. Under appellants' theory, although these agreements are found by the voters to be injurious to the public health, safety, and welfare they are immune from the exercise of the police power if executed before the police power is exercised. The gist of such argument is that rights under a contract are, under the Constitution, more sacred than the public health, safety, and welfare. A mere statement of the proposition demonstrates its absurdity.

*Conclusion*

 In conclusion we find that the right to contract may be abridged by proper exercise of the *state's police power without* violating the Federal Constitution. The yardstick by which we must judge whether our Amendment constitutes such proper exercise of the police power highly confines and limits the scope of our inquiry. We may not pass on the wisdom, the practicability, or the desirability of such legislation. We must look to see only that it has some rational basis; is supportable on some reasonable theory; is not capricious, arbitrary, or discriminatory. We must further guide our view by a strong presumption of validity in favor of such legislation, putting the burden upon those who attack it. Nor does this limited a review by the courts seem untoward. In the last analysis it should be and is the prerogative of the people to determine and experiment with their own social and economic legislation and for the courts merely to see that they do not get "out of bounds" and that they remain within the framework of our government by staying within the limits of the Constitution. No less an authority than Professor Charles O. Gregory, former counsel to the U. S. Department of Labor and one of the nation's foremost scholars and champions of the labor movement, has this to say on the subject of the validity of legislation such as is here before us:

" * * * if a majority of (the voters) see fit to conclude that the closed or union shop be made unlawful in their state, that is their business. And it is hard to see on what grounds such legislation could possibly be overturned as unconstitutional." Gregory, Labor and the Law, Norton & Co., 1st Ed., 1946, page 115.

A consideration of all these fundamental concepts impels the conclusion that this Amendment to the Arizona Constitution, when measured by the yardstick fashioned for us by the United States Supreme Court, does not contravene any provisions of the federal organic law. We cannot say that it does not have a rational basis or could not on some reasonable theory contribute to the public welfare, where, as here, it is addressed to a legitimate end and the measures taken are considered by the voters reasonable and appropriate to that end. The rights of free speech and assembly remain inviolate. Labor's basic rights to organize into a union, bargain collectively, to strike, and peaceably picket are not abridged. These things being established, the wisdom and propriety of the legislative action is not for the determination of the

courts, but is a matter for the determination of the people of this sovereign state upon whom the duty and responsibility of decision rests. There is then both the force of logic and the recognition and will of the people of Arizona that this is necessary and proper legislation. Together with this, there is a similar recognition on the part of the people of fifteen other states and the Federal Government that this is a desirable and proper use of the police power directed toward an appropriate legislative purpose. There can be no valid argument made that such legislation is discriminatory or that its effect upon existing contracts should be limited.

Judgment affirmed.

LA PRADE, J., concurs.

STANFORD, Chief Justice (dissenting in part).

I favor the majority opinion in upholding the following portion of the Amendment:

"No person shall be denied the opportunity to obtain or retain employment because of nonmembership in a labor organization, * * *."

I agree with the statement of law made by Justice Hughes in the case of Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 10, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283, wherein he said:

" * * * It requires no argument to show that the right to work for a living in the common occupations of the commu-

nity is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure. * * * "

The second portion of the Amendment is unconstitutional, for the constitution prohibits the impairment of contracts, but the majority opinion approves and upholds it on the grounds of the state's police power. On that subject from the case of Treigle v. Acme Homestead Ass'n, 297 U.S. 189, 56 S.Ct. 408, 411, 80 L.Ed. 575, 101 A.L.R. 1284, I quote:

"Though the obligations of contracts must yield to a proper exercise of the police power, and vested rights cannot inhibit the proper exertion of the power, it must be exercised for an end which is in fact public and the means adopted must be reasonably adapted to the accomplishment of that end and must not be arbitrary or oppressive."

Also from the case of Home Building & Loan Ass'n, v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 242, 78 L.Ed. 413, 88 A.L.R. 1481, I quote:

" * * * the relief afforded and justified by the emergency, in order not to contravene the constitutional provision, could only be of a character appropriate to that emergency, and could be granted only upon reasonable conditions."

I think that to exercise the police power in support of the second portion of this Amendment is arbitrary and oppressive, and I accordingly dissent.